UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA     )
                             )
v.                           )     Criminal No. 10-10127-MLW
                             )
                             )
DAVID WOOD                   )

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The government asks this Court to sentence David Wood at the low end of the advisory guideline range –110 months -- to be followed by 3 years of supervised release.  It also asks that the Court impose special conditions of supervised release that will keep Wood away from his compatriots from Morse Street and out of the Mattapan and Lower Dorchester areas of Boston.

As noted, the requested sentence is at the low end of the advisory guideline range correctly calculated in the Presentence Report ("PSR").[1]  PSR at ¶95 (calculating Advisory Guideline Range to be 110-120 months).  It is a sentence fully justified by: (1) the serious nature of the offense of conviction (defendant's possession of a loaded firearm with an obliterated serial number while drinking in a bar under the influence of

---

[1] The government has not seen the final version of the PSR, which is required to be filed on or before June 14, 2011.  <u>See Procedural Order Re: Sentencing</u>, (March 22, 2011) at ¶9.  The government reserves the right to supplement this memorandum following its receipt of the Final PSR and the Initial Sentencing Memorandum filed by the defendant.

marijuana and with fake identification because he was underage);
(2) the persistence of the defendant's criminal record (which
shows that, at the age of *only 22*, the defendant has already
amassed 18 criminal history points, been convicted of 4 (adult or
juvenile) crimes of violence, violated probation on every
significant adult case he has caught to date, and has been under
continuous criminal justice supervision for all but 4 months of
the last ten years); and (3) the defendant's membership in the
Morse Street Gang, a street gang operating in Mattapan that has
actively participated in one of the bloodiest gang disputes in
our city.[2]  Based on all of these factors, the government
believes that 110 months imprisonment is the proper sentence in
this case particularly if accompanied by special conditions (such
as geographic and associational restrictions) designed to assist
the defendant avoid opportunities for future crime when he is
released.  The defendant's extensive criminal record, his gang
membership, the fact that he has already been shot twice, and his
possession of a loaded firearm in the circumstances of this case
simply demands that the public be protected and that a guideline
sentence be imposed.

---

[2]  By the time of his arrest here, Wood had also already
been *shot twice* and been injured while sitting in the back seat
of a car that was drag racing.  PSR at ¶¶69-70.  He was 15 when
shot the first time, 17 when shot again, and was 15 when involved
in the drag racing incident.  Id.

## THE OFFENSE OF CONVICTION

The offense of conviction in this case is straightforward and accurately described in the Presentence Report ("PSR") prepared by U.S. Probation.  See PSR at ¶¶9-16.

Shortly after 2 a.m on Saturday, February 27, 2010, officer Luis Lopez and other members of the Boston Police Department's Youth Violence Strike Force were standing outside the Who's on First Nightclub at 19 Yawkey Way, a public way located near Fenway Park.  This is closing time for bars in Boston and the officers were monitoring patrons leaving the bar. Id.

Officer Lopez saw David Wood come out of the bar onto the sidewalk drinking from a bottle of Heineken Beer.  Although Officer Lopez recognized Wood immediately, was aware that he had a criminal record, and believed that he was gang-involved, he was not sure whether Wood was yet 21.  In fact, Wood was only 20 years old at the time of his arrest and was carrying an identification card for Anthony Young another Morse Street member who purportedly had a DOB of 2/27/85. PSR at ¶10. Because Wood was in violation of the Open Container Law regardless of his age, Lopez immediately approached him, removed the open bottle of beer from his hand and moved Wood away from the crowd so that he could speak to him.  As Officer Lopez did so, Wood immediately reached with both hands towards his waist in a manner that raised concerns to both Officer Lopez and Trooper Thomas Duane (who was

standing nearby and was sufficiently concerned that he unholstered his weapon) that Wood might be concealing a weapon or other object. Id., at ¶11.

Officer Lopez, now assisted by Trooper Duane, then placed handcuffs on Wood in order to frisk him.  During that frisk, Lopez felt a hard object in Wood's waist which he recovered and determined to be a .25 Colt semiautomatic weapon that contained six rounds of .25 caliber ammunition and had an obliterated serial number.  Wood's fingerprint was also recovered from the gun, which was thereafter successfully test fired.

Wood was placed under arrest and charged with possession of a handgun and ammunition violating the Boston Open Container Law, and with being a person under the age of 21 in possession of an alcoholic beverage . PSR at ¶13.  Wood was also in possession of a small amount of marijuana[3] and was in the company of Percy Palmer who the government alleges is also a Morse Street member.

## SENTENCING GUIDELINES

Probation's Initial PSR was released on May 16, 2011. The PSR concluded that the defendant had a Base Offense Level of 24

---

[3]  In his Probation interview, Wood claimed that he was only an occasional user of marijuana, "generally smoking one marijuana whenever he or his friends could get marijuana."  PSR at ¶77. Woods admitted, however, that he had last used marijuana "just prior to his [February], 2010] arrest." PSR at ¶78.  Which means, of course, that David Wood was not only drinking with the loaded gun in his pocket but that he was under the influence of marijuana as well.

based on two prior convictions for crimes of violence (an attempted armed robbery of a food delivery driver involving a lead pipe and an assault and battery with a dangerous weapon/larceny from a person case in which the defendant beat and robbed a young man of his cell phone and threatened him with what appeared to be a firearm).  PSR at ¶38,40.  The PSR assessed the defendant with a four-level enhancement under USSG §2k2.1(b)(4) because the serial number on his gun was obliterated, and awarded him a three-level reduction for acceptance of responsibility. PSR at ¶¶22-29.  The PSR also determined that 22-year old Wood has 18 criminal history points and is therefore in Criminal History Category VI. PSR at ¶¶41-43.

The calculated advisory guideline range set forth in the PSR is therefore as follows:

Adjusted Offense Level 25
Criminal History Category VI
Advisory Guideline Range-110 to 120 months
Supervised Release of 2 to 3 years.

PSR at ¶93-108.

**ARGUMENT**

A.  **Factors Supporting the Requested Sentence**

A sentence at the low end of the advisory guideline range is supported by several factors in this case including the seriousness of the defendant's offense, the persistence of his criminal record, the defendant's gang activities, and the fact

that he has already been shot twice and repeatedly demonstrated a blatant indifference to the safety and welfare of others.  These factors and the critical importance of prosecuting and punishing gun cases in Boston's most beleaguered neighborhoods show that a sentence of 110 months is fully complies with 18 U.S.C. §3553.

### 1.  <u>The seriousness of the Defendant's Offense</u>

Although this Court has heard it before, it bears repeating that the day-to day existence for residents in many of our urban neighborhoods is one of violence and unchecked fear.  Despite general reductions in crime rates, the simple fact is that, as the Summer of 2011 approaches, innocent residents in small portions of our district continue to live in constant fear for themselves and their children. <u>See</u> "2 Slain in Violent Weekend" (Boston Globe May 31, 2011)(shootings over 2011 Memorial Day weekend included two homicides in District B-3); "When Fear Fills the Field" (Boston Globe September 21, 2010)(article about shooting during youth football practice at Dorchester and the impact it has had on Pop Warner players)(attached as Exhibits 1 and 2).

Of course, this is nothing new.  Three other  residents were quoted in the Boston Globe on June 6, 2010 the day 14 year old homicide victim Nicholas Fomby-Davis was buried.  Their quotes appear in the articles attached as Exhibit 3.  Countless other residents remain prisoners in their own homes, peering out from

out their blinds in fear, keeping their kids inside, and wondering when the cops, the courts and their community leaders are going to stop the gunfire. <u>See</u>, <u>e.g.</u>, "Savagery Meets its Match in Love," (Boston Globe June 6, 2010) (highlighting loss endured by victim's family and the general fear affecting youth in many Boston neighborhoods)(also included in Ex. 3); "Held Captive by Violence," (Boston Globe June 8, 2010) (discussing young mothers on Creston Street "whose children are held hostage by young men with guns") (Ex. 3); "On Creston Street, Fear and Caution Rule," (Boston Globe June 14, 2010) (follow up on life for residents of Creston Street, "a one-block, one-way stretch in the heart of Grove Hall on the Roxbury-Dorchester Line where residents live in fear")(Ex. 3).

It's easy to say all this.  But the implications are far more important.  What does it all mean to this Court both generally and as it decides to sentence in this case.

The first lesson of course is a chilling confirmation of the lethal effects guns and gangs have, both in our city and elsewhere.  <u>See</u> Kennedy, "Deterrence and Crime Prevention: Reconsidering the Prospect of Sanction (Routeledge Studies in Crime and Economics 2009), p. 78 ("There is an embarrassment of riches on the high rate of gang offending").  <u>See also</u> Braga, et al "New Approaches to the Strategic Prevention of Gang and Group Involved Violence" in C. Ronald Huff (ed), *Gangs in America,*

(Sage Publications 2002)(gangs representing less than 1 percent
of the population were responsible for at least 60% of the
homicides in Boston and at least half the homicides in
Minneapolis, Baltimore, and Indianapolis).   These statistics
point to the solemn obligation the criminal justice system has to
when faced with repeat offenders who persist in carrying guns
because the simple fact is that, when people have guns, they are
available to be used.   And even though David Wood didn't shoot
anyone this time, this is a compelling reason for a significant
sentence in this case.   See generally United States v. Dillard,
214 F.3d 88, 93 (2nd Cir. 2000) ("The prohibition of gun
possession by previously convicted criminals seeks to protect
society by reducing the risk of violence that may result from the
possession of guns by persons inclined to crime.   By possessing
guns in violation of that law, previously convicted criminals
increase the risk that they may engage in violent acts.   The risk
results from the nature of the offense.").

   In our district, the perpetrators of gun violence are often
young, from a small, concentrated area of our city and well known
to the criminal justice system. See Braga, "Losing Faith?
Police, Black Churches, and the Resurgence of Youth Violence in
Boston 6 Ohio State Journal of Criminal Law Volume 1 at 141-172
(Fall 2008) pp. 6-7 (identifying Boston homicide offenders as
young men of color between the ages of 18 and 24 (with an

additional 20.7% under the age of 17), who were well known to the criminal justice system and involved in area gangs (with that number increasing to 76.9% in 2006).  As Braga summarized the profile of these offenders: "Most of the violence is highly concentrated in a few places and among few youth.  These youth tend to be criminally active, gang-involved offenders who were well known to the criminal justice system and caught up in ongoing cycles of retaliatory street violence."[4]  He could be speaking about David Wood.

Relevant statistics confirm that the requested sentence is reasonable and necessary to meet the goals of section 3553.  See PSR at ¶97 (advisory guideline range in this case is 110-120 months).  See also United States Sentencing Commission, "Statistical Information Packet," Fiscal Year 2009 First Circuit, Tables 7 and 10 (2008 Fiscal Year mean and median sentence figures for firearms cases in the First Circuit were 92.3 and 70 months; 53.8% of firearms cases were sentenced within guideline range with 21.3% being sentenced below the guideline range based in whole or in part on Booker).  Comparable figures for the District of Massachusetts for Fiscal Year 2009 are 101.9 months

---

[4] As headlines from area papers all too often show,  the victims in the indiscriminate "retaliatory" violence are often innocent third parties either misidentified by their assailants or simply in the wrong place.  In 2009, for example, the 227 shootings in Boston produced 54 innocent third-party victims who included girlfriends, neighbors, and complete strangers who were beleived not to be the intended targets of the shooter.

(mean) and 67 months (median), with 36.1% of the cases sentenced within the advisory guideline range and 39.4% being sentenced below the guideline range based in whole or in part on <u>Booker</u>.

Second, while it may seem tiresome for the government to ask that a message be sent that firearm violence in our city will not be tolerated by this Court, that is exactly what needs to be done as often and as loudly as possible. <u>See</u> 18 U.S.C. §3553 (a)(1)(B) (sentencing goals include the need to afford adequate deterrence to criminal conduct). <u>See also</u> <u>United States v. Cavera</u>, 550 F.3d 180, 196 (2nd Cir. 2008) (in affirming above-guideline sentence based on local concerns about gun trafficking, Second Circuit noted that, "The environment in which a crime was perpetrated may, in principle, inform a district court's judgment as to the appropriate punishment in any number of ways").

Deterrence is important because it can (but does not always) work to reduce crime and the misery so often imposed on innocent victims caught in the crossfire. <u>See, e.g.</u>, McDowell et al, "A Comparative Study of the Preventative Effects of Mandatory Sentencing Laws for Gun Crimes," 83 Journal of Criminal Law and Criminology 378-394 (1992) (mandatory sentences for gun crimes reduced violent crime in a pool of six cities).

But deterrence matters only when it is effectively communicated. At least one commentator has correctly recognized that "the deterrence threat may best be viewed as a piece of

advertising." Zimring and Hawkins, *Deterrence, the Legal Threat in Crime Control,* p.142 (Univ. Of Chicago Press 1973). Through its decisions, this Court is in a unique position to send out messages to the target audience perpetrating the violence. Lenient sentences (or decisions which criticize sentencing guidelines or federal prosecutions of gun and drug cases) risk sending a message that the conduct at issue carries little risk or that the sentences imposed are somehow unjust and therefore lack moral suasion.  See "Judge Skips Guidelines, Releases Man in Crack Case" (Boston Globe November 21, 2007)(story about federal judge sentencing crack dealer at Bromley Heath to time served and stating that "prison sentences for such crimes often do more harm to black communities than good").  Such messages can also undercut law enforcement efforts to make communities safer and exacerbate mistrust between the police and the people they serve. Compare Skogan et al,(eds) *Fairness and effectiveness in Policing: the Evidence (*National Academies Press 2001) at 6 ("Research has found that people obey the law not just because they are afraid of being punished or because they believe the law is morally right, but also because they believe the law and its enforcement is impartial and being fairly administered") with United States v. Bannister, --- F.Supp.2d ----, 2011 WL 1361539, *39 ("General deterrence particularly may be impaired when the perceived injustice of punishment damages the credibility of the

justice system"). On the other hand, messages that take into account the seriousness of gun violence and the need to protect innocent residents by imposing stiff gun sentences on gang members can help make communities safer and deter others from committing the same crimes. See United States v. Politano, 522 F.3d 69, 72 (1st Cir. 2008) (in affirming above-guideline sentence in firearm trafficking case, First Circuit noted sentencing judge's reference to the "epidemic of handgun violence in communities within this district" and concluded that the district court "has the authority to conclude that the impact of this particular offense is more serious than that reflected by the Sentencing Commission."); United States v. Johnson, 631 F.Supp. 2d 946, 951 (E.D. Tenn 2009) (affirming *above*-guideline sentence based on, among other things, the frequency and escalating nature of the defendant's crimes and the resulting need to protect the public).

### 2.   The Defendant's Criminal Record

What makes such a message so appropriate here is the defendant and his history. To even look at the defendant's criminal record is to see how serious it is and how much he needs to be taken off the street to protect the community and to protect David Wood from himself. Since joining the criminal justice system in 2002 at age 12, the defendant has been under

some form of judicial supervision virtually ever since.[5]  During
this time, the defendant has been convicted of (or found to be
delinquent on) 8 separate cases including 4 crimes of violence.
See PSR at ¶¶35 (violence directed towards mother); 36
(ABDW/Resisting Arrest juvenile case in which defendant rammed
police vehicle attempting to escape and then hit various other
parked cars during high speed chase and resisted arrest
sufficiently seriously so as to send one of the arresting
officers to the hospital); 38 (Attempted Armed Robbery case in
which defendant and fellow Morse Street members Broshawn Coakley,
Andre Bennett, and Justin Thompkins were caught as they prepared
to rob a food delivery man with a lead pipe); 40 (ABDW/Larceny
case in which defendant robbed and threatened to beat victim in
order to steal cell phone).

     What is worse than the crimes that the defendant has
repeatedly committed, has been his reaction to the efforts of the
criminal justice system (both juvenile and adult) to help him.
In the last 10 years, David Wood has been put on some form of
probation or parole on 7 cases (4 juvenile, 3 adult), PSR at
¶¶33, 34, 35, 36, 38, 39, and 40), and has violated that

---

     [5] The only period the government has been able to identify
when the defendant was not under some form of judicial
supervision is four months in 2007 between the time he turned 18
(and was discharged from DYS custody) and his first adult arrest
in August, 2007 when he was arrested for Attempted Armed Robbery.
See PSR at ¶¶36 (discharge), 38 (first adult arrest).

probation and/or parole on every one of them (sometimes multiple
times). He was committed to DYS Custody between the ages and 12
and 18 and repeatedly had his conditional release revoked for
violating the terms of parole, usually because he committed more
crime. Id. at ¶¶33, 34, 35 and 36.  He has since spent
substantial amounts of time in adult custody, often after
squandering leniency afforded him by state courts. Id. at ¶¶38
(given 2 ½ year sentence on armed robbery, with only 1 year to
serve; but remaining 18-month term imposed after probation
violation); 40 (placed on probation for second ABDW/Larceny from
the Person case, only to violate probation and have 23-month
sentence imposed).  Indeed, Wood committed the crime of
conviction here *less than two months after being paroled* from
adult custody in his robbery case and has another state case
pending against him for yet another crime committed during one of
the brief periods in which he was out.  See PSR at ¶¶40 (Wood
Paroled from state robbery case on December 24, 2009, 63 days
before being arrested with gun here); 45 (Defendant has not yet
been arraigned on new state case involving claims that Wood
entered residence at 60 Homestead Street causing "panicked
sounds" from resident and then fled when approached by police
leaving rental car behind).  All of this shows that the requested
sentence of 110 months -- the low end of the guideline range --
is justified in this case.  E.g., United States v. Smith,505 F.3d

463, 471 (6th Cir. 2007) (imposing above guidelines sentence
where it was obvious that prior incarceration "was obviously not
sufficient to comply with the purposes of § 3553(a)(2)"); <u>United
States v. Hernandez</u>, 896 F.2d 642, 645 (1st Cir. 1990)("a
defendant undermines the integrity of the criminal justice system
when he commits a crime while under its supervision and
control"); <u>United States v. Perez</u>, 2006 WL 573791 (E.D. Pa. 2006)
("The discipline of a corrective institution for a significant
period of time is necessary given the ineffectiveness of Perez's
prior sentences and his apparent inclination against conforming
his behavior to the law").

     As compelling as all this is, there is more.  Even putting
the defendant in jail does not appear to have stopped his
misconduct or his appetite for violence.  The PSR lists multiple
disciplinary reports including ones for fighting and possessing a
weapon. PSR at 86.  Although the defendant told Probation that he
did not recall the circumstances of his D-report for fighting,
that may be because it involved a gang-related dispute against an
associate of Lucerne Street.  <u>See</u> Disciplinary Report attached as
Exhibit 4. Even his own family members have faced the defendant's
inability to control himself on numerous occasions. <u>See</u> PSR at
¶56 (defendant's mother had to "occasionally" call police "to
report that defendant had run away, had hit tackled her (at times
pinning her down) or had become too difficult to control.  Mrs.

Maldonado advised that Wood's probation officers were also unable to control him and that Wood refused to participate in or was not offered any treatment and programming which would have helped him").

**3.   The Defendant's Membership in the Morse Street Gang**

Another important factor in this sentencing is the defendant's active membership in the Morse Street Gang. As one federal sentencing judge has noted, "Unlawful firearm possession-particularly when it is connected, even loosely, to gang membership-is a very serious crime." United States v. Mercado, 2009 WL 1770126 (E.D. Wis. 2009). And so it is here. The government has already requested an evidentiary hearing in this case to demonstrate the defendant's gang involvement.  As is indicated in the expert disclosure attached as Exhibit 5, that will be based on a whole range of factors relating to the defendant's activities, his crimes, and his companions.  But two things stand out.  The first is the tattoos David Wood wears honoring Morse Street members killed in prior area violence, see Exhibits 6 and 7.  The second is the photograph attached as Exhibit 8 in which the defendant can be seen making the sign for the Morse Street Gang--the letter "M" and wearing Morse Street colors (the Milwaukee brewers hat).  The government's gang expert, BPD Sgt. Det John Ford, will identify the other individuals in this picture (including Henry Coakley, Anthony

Howard, Leon Spears, Frankie Fairweather, and Broshawn Coakley) as Morse Street members and will explain more fully the basis for his opinion that the defendant is in Morse Street member.  This also supports the requested sentence. See Huebner, et al., "Gangs, Guns, and Drugs: Recidivism Among Serious, Young Offenders" Criminology & Public Policy Volume 6 Issue 2 (2007)("Gang membership, even within a high-risk sample, emerged as a significant predictor of recidivism as more traditional risks for offending, such as gun use, demographics, prior convictions, and community disadvantage, did not"). See also United States v. Johnson 184 Fed. Appx 746 (10th Cir. 2006)(at sentencing, gang membership was "significant" and appropriate for inclusion in the PSR because. . . . "gang members are more likely to engage in criminal activity and perhaps related violence than ordinary citizens"); United States v. Aquirre-Roche, 305 Fed.Appx. 567 (11th Cir. 2008)(district court properly considered defendant's gang membership at sentencing);  United States v. Hernandez-Villanueva, 473 F.3d 118 (4th Cir. 2007)(imposing above-guideline sentence based on defendant's gang activities).

B.  **Supervised Release Issues**

Given the foregoing, associational and geographic restrictions are particularly appropriate in this case in that even the defendant's own family recognizes that it is David Wood's associations have been a problem for him.  See PSR at ¶13

-17-

(defendant's mother noted behavioral changes when he began associating with "negative peers").  Geographic restrictions from District B-3 and Associational Restrictions comparable to those given to Broshawn Coakley and Matthew Davis, two other Morse Street Members prosecuted federally in recent years,[6] is important.  Proposed restrictions are attached as Exhibits 9 and 10.

The government also believes that the defendant should be required to reside in a halfway house for the first six months of his supervised release.  Although it appears both he and his family assume that the defendant will be able to live at his mother's house upon release, that may not be possible because she lives in subsidized housing. PSR at ¶59.

An issue that comes out of the PSR very clearly is the possibility that the defendant has learning issues and would therefore benefit from a learning disability assessment upon release.

The government also believes that the defendant should be drug tested and should receive drug counseling throughout his supervised release.  Mental health counseling should also be made available as needed and appropriate.  Any available vocational

---

[6] See Judgments of Conviction in United States v. Coakley, Criminal No. 10-10022-RWZ and United States v. Matthew Davis, Criminal No. 08-10166-RGS.

training should also be made available to help improve the defendant's future job prospects and the defendant should be assisted in getting his GED if he does not do so while incarcerated.

                              Respectfully submitted,

                              CARMEN M. ORTIZ
                              UNITED STATES ATTORNEY

                    By:   /s/John A. Wortmann, Jr.
                              JOHN A. WORTMANN, JR.
                              Assistant U.S. Attorney
                              One Courthouse Way
                              Boston, MA
                              (617) 748-3207


                    **CERTIFICATE OF SERVICE**

     The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

                              /S John A. Wortmann, Jr.  6/1/11